IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | ) | Case no. 24-11728-PMM |
|  | ) |  |
| PHILADELPHIA ORTHODONTICS, P.C., | ) | Subchapter V |
|  | ) |  |
| *Debtor.* | ) |  |

**DECLARATION OF JOSHUA DAVIS, PRESIDENT
OF PHILADELPHIA ORTHODONTICS, P.C. IN SUPPORT OF FIRST DAY MOTIONS**

I, Joshua Davis, hereby declare as follows:

1. I am the President of Philadelphia Orthodontics, P.C., Debtor and Debtor in Possession (the "Debtor"), in the above captioned small business bankruptcy case, filed pursuant to 11 U.S.C. Subchapter V (the "Subchapter V Case"). I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age and competent to testify.

2. I submit this declaration (this "Declaration") in support of certain First Day Motions (as defined below) to assist this Court and parties in interest in understanding the Debtor's business and its operations and the circumstances that compelled the commencement of the Subchapter V Case. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by others, my review of relevant documents or my opinion based on my experience and knowledge of the Debtor's operations, financial condition, and present financial outlook. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Debtor to submit this Declaration.

3. Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the applicable First Day Motion.

{C1314969.1 }

## INTRODUCTION

**A.    The Subchapter V Case**

4.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor intends to continue in the possession of its property and management of its business as a debtor in possession as defined by Section 1182 of Subchapter V of the Bankruptcy Code and pursuant to the requirements set forth in Section 1187 of Subchapter V of the Bankruptcy Code.

5.    The Debtor commenced the Subchapter V Case to pursue a reorganization of the Debtor's assets and liabilities, and in order to pay the Debtor's obligations while preserving its business operations and jobs held by its employees.

6.    Additionally, on the Petition Date, I filed an individual voluntary petition under Subchapter V of the Bankruptcy Code. As set forth below, the Debtor and I seek to have our respective bankruptcy cases jointly administered.

**B.    The Debtor's Business, Assets, and Financial Performance**

i.    The Debtor's History and Business Operations.

7.    The Debtor is a Pennsylvania professional corporation. The Debtor was formed for the purpose of providing orthodontics care to patients in Philadelphia, Pennsylvania, and the surrounding area.

8.    The Debtor maintains an orthodontics practice at a clinic location in the Center City Philadelphia neighborhood, at 1420 Walnut Street, Suite 518, Philadelphia, Pennsylvania 19102.

9.    I am a Doctor of Dental Medicine, and the Debtor's sole professional, providing orthodontic treatment, with the assistance of our staff, which includes orthodontics assistants, patient and treatment coordinators, and other administrative staff.

10. The Debtor provides specialized orthodontic treatment to children, teens, and adults, including braces, Invisalign, surgical orthodontics, and ongoing maintenance and routine care for orthodontics patients. The Debtor generates substantially all of its revenue through these patient care services, from either self-pay and/or insurance reimbursements.

ii. Employees.

11. The Debtor employs thirteen (13) Employees. The Debtor's highly skilled Employees occupy a variety of positions. The Employees' skills, knowledge, and understanding of the Debtor's operations and infrastructure are essential to preserving operational stability, efficiency, and continuity of care for the Debtor's patients.

12. The Employees are paid on a bi-weekly basis, every other Friday, for the prior period Monday through the fourteenth date (i.e., Sunday of the second week) (the "Pay Period").

13. Distribution of the payroll is handled by Patriot Payroll Service (the "Payroll Processor") with the support of the Debtor's Employees.

14. The Payroll Processor has access to the Debtor's Bank of America bank account ending in xxx-2296 (the "Operating Account"), whereby the Payroll Processor transfers from the Operating Account, an amount sufficient to cover the then current payroll-- for the Pay Period-- on Tuesday. The Payroll Processor similarly directly debits the Operating Account for the employee and employer taxes and other deductions, including retirement plan contributions, and remits such payments to the appropriate third party on the Debtor's and employees' behalf.

15. The Debtor paid the Employees in the ordinary course on Friday May 17, 2024, for the Pay Period ending on Sunday May 12, 2024.

iii. The Debtor's Assets and Liabilities.

16. As of the Petition Date, the Debtor's assets consist primarily of dental equipment,

ongoing payment rights under patient services contracts, and cash. The Debtor's cash position as of the Petition Date is approximately twenty thousand dollars ($20,000).

17. As of the Petition Date, the Debtor's primary secured creditor is Bank of America. The Debtor owes Bank of America approximately $83,000 as of the Petition Date, pursuant to a business loan and security agreement. I believe that Bank of America has a perfected first priority lien on substantially all of the Debtor's assets.

18. The Debtor largest obligations are priority tax obligations owed to the Internal Revenue Service, the Pennsylvania Department of Revenue, and the City of Philadelphia.

19. The Debtor also owes purchase money to security lenders, who maintain liens against equipment purchased with the proceeds of said loans.

20. The Debtor's largest general unsecured creditors are merchant cash advance lenders, who the Debtor believes are unsecured, regardless of the filing of any UCC-1 financing statements, because the value of the Debtor's assets does not exceed the value of Bank of America's secured claim.

21. The Debtor's remaining unsecured creditors are trade creditors, and the debt owed to such creditors is trade debt incurred in the normal course of the Debtor's business.

iv. The Debtor's Financial Performance.

22. The Debtor's operations continue to provide sufficient revenues to maintain business operations. However, the Debtor has insufficient cash to pay its outstanding obligations – specifically its outstanding priority tax obligations and general unsecured creditors – and maintain business operations.

23. The Debtor has provided its most recent prepared Balance Sheet, Income Statement, and Statement of Cash Flow, which show the Debtor's financial performance in 2023. The Balance

Sheet and Income Statement were prepared and used in preparation of the Debtor's 2023 tax returns. The Debtor has also provided its most recently filed tax return for the tax year 2023, which shows the Debtor's historical financial performance.

## OBJECTIVES OF THE SUBCHAPTER V CASE

24. In spite of its inability to pay its creditors, the Debtor has sufficient cash flow and ongoing concern value and has determined that a reorganization is the best option for maximizing value of its assets for the benefit of all stakeholders, while maintaining jobs for its employees.

25. The Debtor has prepared a six (6) month forecast/projection that estimates sufficient liquidity to fund its operations and restructure its debts post-petition.

## FIRST DAY MOTIONS

### A. Joint Administration Motion

26. By the Joint Administration Motion, the Debtor seeks entry of an order directing the joint administration of its Subchapter V case with my individual Subchapter V Case (collectively, these "Jointly Administered Subchapter V Cases") for procedural purposes only. The Debtor and I are co-obligors of a large majority of the debts to be reorganized under the Subchapter V bankruptcy cases. Moreover, many of the motions, hearings and other matters involved in these Jointly Administered Subchapter V cases will affect both the Debtor's estate and my estate. Therefore, I believe that the joint administration will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the estates.

### B. Emergency Motion for an Order Authorizing the Continued Use of Pre-Petition Bank Accounts and Existing Cash Management System.

27. Before the Petition Date, the Debtor, in the ordinary course of business, maintains the bank accounts detailed in the Debtor's Cash Management Motion (collectively, the "Bank Accounts").

28. The Debtor seeks a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If enforced in this Subchapter V Case, this requirement would cause enormous disruption in the Debtor's business and would impair its efforts to reorganize.

29. Maintaining the Bank Accounts would greatly facilitate the Debtor's "seamless transition" to postpetition operations. To avoid delays in paying debts incurred postpetition and to ensure as smooth a transition into chapter 11 as possible, the Debtor should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations. Otherwise, transferring the Bank Accounts will be tremendously disruptive and time-consuming. Indeed, the Debtor's customers/patients and other third parties, including insurance payors, routinely remit payments to the Debtor via electronic transfers. By permitting the Debtor to maintain the Bank Accounts, the Court will enable the Debtor to avoid confusion associated with providing its customers/patients and other third parties new electronic transfer information and the possibility that such party will attempt to electronically transfer funds into a closed bank account.

30. The Debtor also seeks a waiver of the requirement that it establishes specific bank accounts for tax payments. I believe that tax obligations can be paid most efficiently out of the existing Bank Accounts, that the United States Trustee can adequately monitor the flow of funds into, among and out of the Bank Accounts, and that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessary and inefficient.

31. To minimize expense to the Debtor's estate, I believe that the Debtor should be authorized to continue to use all correspondence and business forms (including, but not limited to, letterhead, service agreements, appointment agreements, ACH authorizations, invoices, etc.), as well

as checks existing immediately before the Petition Date, without reference to its status as debtors-in-possession. Once the Debtor runs out of preprinted checks that do not bear that designation, the Debtor will add such designation to any new checks it obtains or creates post-petition.

32. Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor-in-possession. Changing correspondence and business forms is therefore unnecessary, and would burden the estate by the expense involved and also would disrupt the Debtor's business operations.

33. The Debtor's cash management system is relatively simple and straight forward. All of the Debtor's receipts and disbursements are made from the Operating Account.

34. With respect to employee payroll, the Operating Account is used to fund the Payroll Account and, in turn, payment of payroll and related taxes. The employees of the Debtor are generally paid their compensation by the Payroll Processor. Direct deposits and tax payments are all processed by the Payroll Processor. The Payroll Processor deducts the direct deposit amount from the Bank Account and transfers the money to each employees' bank account. These transfers are made by Payroll Processor, at the direction of the Debtor and in accordance with the payroll information transmitted to the Payroll Processor.

35. The Debtor seeks authority to continue utilizing its current cash management system, as described above. Substantially disrupting this cash management procedure would severely impair the Debtor's ability to preserve and enhance its respective going concern values and to successfully reorganize during this Subchapter V Case. Moreover, opening new accounts and establishing a new cash management system would also inevitably have a deleterious effect on the Debtor's record keeping – which would subvert the goal of the U.S. Trustees guidelines. It is essential, therefore, that

the Debtor be permitted to continue to use its current Bank Accounts and current cash management system.

36. The Debtor has utilized its cash management system as described herein in its current basic structure for more than a year in its ordinary, usual and essential business practices.

37. The widespread use of this type of cash management system, moreover, is attributable to the numerous benefits it provides, including the ability to (a) control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the cash management system, will facilitate and enhance the Debtor's reorganization efforts to maximize its assets for the benefit of its stakeholders. For similar reasons, the Debtor should be authorized to continue to fund its business and operations by payments made from the Operating Account.

B. **Emergency Motion of the Debtor for an Order (A) Authorizing the Payment of Employee Obligations; (B) Authorizing the Maintenance of Employee Benefits Programs in the Ordinary Course; and (C) Directing Banks to Honor Prepetition Checks for Payment of Employee Obligations**.

38. Prior to the Petition Date and in the ordinary course of its business, the Debtor provided its employees (the "Employees") with wages, paid time off (PTO), a Simple IRA plan and other compensation. The Debtor seeks authority to pay the accrued but unpaid pre-petition compensation owed to its Employees (along with payroll taxes and other related amounts) in accordance with the Debtor's ordinary business practices. The Employees are essential to the orderly operation and survival of the Debtor's business. Consequently, it is critical that the Debtor continues to honor its prepetition obligations to the Employees.

39. If the Employee obligations are not honored and timely paid, the Employees may suffer personal hardship and be unable to pay their daily living expenses, and may be required to bear personally expenses that were incurred on behalf of the Debtor with the expectation that they would be reimbursed. There would undoubtedly be a marked deterioration in morale among employees at a critical time, and an attendant negative impact on the Debtor and its operations which could only diminish the value of the Debtor's assets and its ability to achieve its objectives in Chapter 11.

40. The Debtor employs thirteen (13) full-time employees. The Employees are paid bi-weekly on every other Friday for the work they performed during the previous Monday through Sunday.

41. Distribution of the payroll is generally handled by the Payroll Processor with the support of the Debtor. The Payroll Processor has access to the Operating Account whereby the Payroll Processor transfers from the Operating Account, an amount sufficient to cover the then current payroll. The Payroll Processor similarly directly debits the Operating Account for the employee and employer taxes and other deductions and remits such payments to the appropriate third party on the Debtor's and employees' behalf.

42. The Debtor paid the Employees in the ordinary course on May 17, 2024, for work that was performed through May 12, 2024.

43. The Debtor seeks to pay its Employees for six (6) days of pre-petition work for which payment has not yet been made and remit the related taxes and payroll deductions to the appropriate third parties ("Withholding Obligations"), not to exceed the maximum amount entitled to priority pursuant to Section 507(a)(4) of the Bankruptcy Code.

44. Under the Debtor's PTO policy, the Employees earn PTO days (accrued on a

monthly basis), at a rate of .6 hours, for each hour worked.

45. The Debtor does not seek to pay accrued PTO pay in a lump sum, but rather to continue to allow each affected Employee to use or take accrued PTO or pay for unused PTO time.

46. Prior to the Petition Date and in the ordinary course of its business, the Debtor reimbursed Employees for actual, reasonable, and proper business and/or travel expenditures incurred in the normal course of their employment (collectively, the "Reimbursable Expenses"). The Debtor does not at this time know the precise amount of such incurred but unreimbursed Reimbursable Expenses, but the Debtors estimate that the amount is less than $1,000.00.

47. The Debtor provides an opportunity for eligible employees to participate in a Simple IRA Plan. Employees may make elective deferrals up to the maximum allowable by law by way of payroll deductions. The Debtor matches Employees contributions up to three percent (3%).

48. In the ordinary course of its business, the Debtor maintains an employee benefits program that provides the Employees with medical/health insurance benefits, dental, short and long term disability, group life insurance and various other benefits (collectively, the "Employee Benefits"). These benefits are provided pursuant to pre-petition contracts between the Debtor and insurance company/benefit providers. The Debtor intends to satisfy its post-petition obligations for benefits received under the pre-petition contract in the ordinary course of business.

C. **Emergency Motion to Approve Use of Cash Collateral**.

49. The Debtor has also sought authority to use the cash collateral of Bank of America. For the reasons set forth below, the Court's approval of this motion is absolutely critical.

50. The Debtor believes that the best means to maximize the value of the Debtor's assets is to reorganize its debts during the course of this Subchapter V Case.

51. In order to reorganize, the Debtor requires use the cash collateral of its senior secured lender, Bank of America, in the ordinary course of the Debtor's business.

52. Moreover, Parkview Advance, Rapid Finance, Forward Financing, LLC, and/or Biz2Credit (Itria Ventures, LLC) (collectively, the "MCA Lenders") may assert junior liens on interest in cash collateral and, therefore, to the extent that any of the MCA Lenders have valid and perfected liens against any cash collateral, the Debtor requires the use of cash collateral of the MCA Lenders in the ordinary course of business.

53. In exchange for the use of Bank of America's cash collateral, the Debtor proposes to: (i) grant Bank of America a post-petition security interest in, and lien upon, all categories and types of collateral in which it held a security interest as of the Petition Date (the "Bank of America Post-Petition Lien"); and (ii) commence adequate protection payments from cash collateral in an amount equal to $2,808.00, i.e., the normal, non-default monthly payment made by the debtor pursuant to its pre-petition agreement with Bank of America (the "Adequate Protection Payment").

54. Moreover, the Debtor proposes to grant replacement liens only to the extent of any valid and perfected pre-petition lien, in favor of each of the MCA Lenders, to the extent of each MCA Lenders respective pre-petition lien (collectively with the Bank of America Post-Petition Lien, the "Replacement Liens").

55. The Replacement Liens shall only be to the same extent, and have the same priority, as each lender's respective security interest as of the Petition Date. All security interests to be granted to each lender as adequate protection will, to the extent perfected prior to the Petition Date, be deemed duly perfected under all applicable laws, and no further notice, filing, recordation or Order will be required to perfect such an interest.

D. **Motion for Authority to Pay Salary to Principal Pursuant to Local Bankruptcy Rule 4002-1**

56. Prior to March 2024, I did not take a regular salary or an annual rate of compensation as an employee of the Debtor. Rather, I was paid profit distributions by the Debtor in my capacity as its sole shareholder.

57. In March 2024, in an effort to organize, streamline, and improve the Debtor's financials, I ceased taking shareholder distributions and instead began taking regular compensation in the form of a yearly salary.

58. In order to ensure the compensation received by me was commensurate with the fair market value of his services, I consulted *Indeed.com* and, based on market information, devised a salary which reflects my education, expertise, and years of experience as an orthodontist, and my expected salary in the market.

59. Specifically, I instituted a yearly salary of Three Hundred and Ninety Thousand Dollars ($390,000).

60. The Debtor requests authority from this Court pursuant to Local Rule 4002-1 to pay my annual salary in the ordinary course of business during the pendency of this Bankruptcy Case.

## CONCLUSION

In order to minimize any loss of value to the Debtor's business, the Debtor's immediate objective is to engage in business as usual following the commencement of this Chapter 11 Case, with as little interruption to its operations as possible, in order to pursue a reorganization. I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors of the Debtor's estates, will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 21, 2024

/s/ *Joshua Davis*
By: Joshua Davis
Title: President